IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VICTOR HUGO SILVESTRE GARCIA,<br>    Plaintiff,<br><br>v.<br><br>S&F LOGISTICS, *et al.*,<br>    Defendants. | :<br>:<br>:<br>: Civil No. 5:21-cv-04062-JMG<br>:<br>:<br>: |

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                                                                September 29, 2025

## I. INTRODUCTION

This is a negligence action against Defendants John McCollum ("Defendant McCollum") and S&F Logistics, LLC (collectively "Defendants"). Plaintiff Victor Garcia ("Plaintiff") alleges that he suffered injuries as a result of an automobile accident that occurred on August 12, 2019, when Defendant McCollum crashed his commercial motor vehicle into the back of the trailer Plaintiff was driving. Defendant McCollum was an employee of S&F Logistics and was acting within the scope of his employment during the time of the accident. Plaintiff alleges that as a direct and proximate result of the accident he has suffered injury.

## II. PROCEDURAL HISTORY

Defendants initiated this action on September 13, 2021, when they successfully removed this case to federal court. *See* ECF No. 1. On November 4, 2021, this Court denied Defendants' Motion to Dismiss for Failure to State a Claim. *See* ECF Nos. 2, 8. Subsequently, Defendants submitted a Discovery Plan on November 22, 2021, and an Answer to Plaintiff's Complaint on December 3, 2021. *See* ECF Nos. 13, 16.

Following a Rule 16 conference with all Parties, this Court executed a Scheduling Order which required the parties to meet and schedule dates for depositions by December 21, 2021, along with outlining the dates for discovery deadlines. *See* ECF No. 20. Plaintiff informed this Court on June 7, 2022, by filing a Motion to Compel Depositions of Defendants and a Motion to Compel Discovery Responses from Defendants, that Defendants had failed to appear at their properly noticed depositions. *See* ECF Nos. 32–34. Defendants responded to each individual Motion on June 21, 2022. *See* ECF Nos. 39–40. One day later, this Court granted Plaintiff's Motions and ordered the requisite depositions to occur within twenty-one (21) days. *See* ECF No. 41. Additionally, Defendants were ordered to share with Plaintiff all relevant discovery documents within twenty-one (21) days. *Id.*

However, Defendants still failed to comply with the Discovery Order from this Court. Due to Defendants failure to comply with the Discovery Order, Plaintiff filed a Motion for Sanctions, which this Court granted, and entered default judgment on liability against Defendants for failure to appear, plead, or otherwise defend. *See* ECF Nos. 46, 53–54. Under Federal Rule of Civil Procedure 55(B)(2), damages were to be considered separately. *See* ECF No. 53. A damages hearing occurred over two days in February 2023. *See* ECF Nos. 55, 83, 90; *see also* ECF Nos. 103–04.

A bench trial was held from February 21, 2023 through February 22, 2023. The parties subsequently filed Proposed Finding of Facts and Conclusions of Law. *See* ECF Nos.107–08. The following findings of fact and conclusions of law are based upon the evidence presented at trial, the parties' submissions, and the arguments advanced by counsel at the damages hearing. For the reasons set forth below, judgment in the amount of $535,392.41 is entered in favor of Plaintiff and against Defendants.

### III. FINDINGS OF FACT[1]

#### A. Liability Has Been Established by this Court

1. This case arises out of a collision that occurred on August 12, 2019, when Defendant McCollum crashed his commercial motor vehicle into the rear of the trailer Plaintiff was hauling in the Eastern District of Pennsylvania. *See* Trial Transcript, February 21, 2023 ("Feb. 21 Tr. Trans.") at 33:19–34:17; *see also* ECF No. 107 at ¶ 3.

2. Default judgment was entered against Defendants as to liability on October 24, 2022. *See* ECF Nos. 53, 54.

#### B. Parties

3. At the time of the accident, Defendant McCollum was acting in the course and scope of his employment with Defendant S&F Logistics, LLC. *See* ECF No. 107 at ¶ 3.

4. Plaintiff is from Matamoros, Mexico, close to the Texas border. Feb. 21 Tr. Trans.at 29:9–13

5. For the past nineteen (19) years, Plaintiff has worked as an operator of a trailer. *Id.* at 30: 4–7.

6. Plaintiff holds a Mexican license which allows him to travel into the United States roughly every fifteen (15) days. *Id.* at 30:14–20.

#### C. Accident on August 12, 2019

7. On August 12, 2019, Plaintiff was driving Highway 81 in the left lane where traffic was stopped. *Id.* at 33:21–22.

---

[1] The Findings of Fact are substantially derived from the parties' Proposed Findings of Fact filed at ECF Nos. 107–08.

3

8. Plaintiff testified he made a full stop, then proceeded to look in front of him and then look in his rearview mirror on the left side, where he observed a truck coming towards him at considerable speed. *Id.* at 33:25–34:10.

9. Once realizing that the truck was not going to stop, Plaintiff held on tightly to the steering wheel. *Id*. at 34:9–13.

10. Plaintiff felt the impact when he looked through the mirror on the left side. *Id*. at 34:16–17.

11. Plaintiff testified at the damages hearing the force of the collision made his head move forward and then snap back and hit the headrest. *Id.* at 55:1–9.[2]

12. Plaintiff testified that he was wearing his seatbelt and thus only his head and neck were moved forward because his torso and lower body were held in place by his seatbelt. *Id.* at 34:20–25.

13. Plaintiff claims he did not experience any immediate pain from the accident because of the initial adrenaline. *Id.* at 35:16–21.

14. Hours after the accident, on the night of August 12, 2019, Plaintiff began to experience significant pain from his neck down to his shoulder on the right side of his body. *Id.* at 35:22–36:2.

15. Plaintiff testified he did not experience any of these pains prior to the crash. *Id.* at 36:20–22.

16. Plaintiff did not seek medical care until several days after the accident. *Id.* at 36:3–12.

---

[2] However, at Plaintiff's deposition he testified he moved his head voluntarily to look at the vehicle in front of him. Feb. 21 Tr. Trans. at 55:10–53:15.

17. Plaintiff testified he waited until the pain continued for several days because he does not like to go to the doctor for mild pain. *Id.* at 36:13–19.

18. Plaintiff's wife, Claudia Melendez, testified Plaintiff did not initially seek medical care because Plaintiff doesn't like doctors and did not want to miss work, as he was not a salaried employee. *Id.* at 98:8–20.

19. Plaintiff continued working after the accident to earn his paychecks because he was the breadwinner of his family. *Id.* at 30:25–31:3, 60:6–14.

### C. Impact on Plaintiffs Life Pre-Surgery and Treatment Received

20. Prior to the surgery, Plaintiff's pain from the accident affected his daily routine and activities. *Id.* at 38:2–6.

21. His pain impeded his passion for truck driving because he could not lift heavy loads as he used to, and he struggled to sit in his truck for long periods of time. *Id.* at 30:8–13, 38:7–15, 38:24–39:5.

22. The pain before the surgery also impacted Plaintiff's relationship with his family. *Id.* at 39:6–8.

23. For example, Plaintiff's adult daughter stopped having play fights with him. *Id.* at 29:16–19, 39:10–24.

24. Before the surgery, Plaintiff's enjoyment of and participation in soccer were also impacted. *Id.* at 40:2–22.

25. Prior to the accident, Plaintiff played soccer whenever he had any free time on weekends that he was home. *Id.* at 31:9–12.

26. Plaintiff testified he had previously never suffered an injury from soccer or left a soccer game with the type of neck pain he experienced after the accident. *Id*. at 31:25–32:5.[3]

27. Once Plaintiff saw a doctor, Plaintiff began pain medication and rehabilitation, neither of which resolved his neck pain. *Id.* at 36:23–37:7.

28. Plaintiff also underwent injections to his neck in attempt to resolve the pain. *Id.* at 37:13–15.

29. An eventual MRI revealed Plaintiff suffered at least one disc protrusion in his neck which created spinal cord compression and minor stenosis. Alex Willingham Deposition Transcript, February 17, 2023 ("Willingham Dep.") at 17:18–18:7, 24:22–25.

### D. Surgery

30. Ultimately, on June 19, 2020, Plaintiff underwent an anterior cervical disc fusion surgery in Texas. *See* Willingham Dep. at 23:3–4; *see also* Feb. 21 Tr. Trans.at 37:16–38:1, 84:18-19, 99:13–100:3.

31. This surgery fused a segment in Plaintiff's cervical spine to decompress the disc protrusion in his neck. Willingham Dep. at 17:18–18:7.

32. Plaintiff claimed that his condition improved after receiving the surgery. Feb. 21 Tr. Trans.at 41:18–42:2.

33. Following the surgery, Plaintiff reported that he does not frequently still have pain in his neck but does occasionally experience pain which impacts his daily routines with his wife and kids. *Id.* at 42:12–20.

---

[3] Plaintiff played a mid-field attack position where he frequently hit the ball with his head and admitted that he has headed a soccer ball upwards of roughly three thousand times in his lifetime. Feb. 21 Tr. Trans. at 40:8–12, 62:16–19.

34. However, Plaintiff testified there is nothing he cannot currently do that he did before the accident. *Id*. at 44:17–23.

35. In fact, Plaintiff informed Dr. Alex Willingham he has returned to the same amount of time and mileage driving for his job. Willingham Dep. at 43:23–44:4.

36. At the time of the Damages Hearing, Plaintiff had not received medical care for his neck in over a year, nor did he have plans to see a doctor in the future unless absolutely necessary. Feb. 21 Tr. Trans. at 49:21–50:1, 50:14–51:3.

### E. Lasting Impact of the Accident on Plaintiff

37. Since the accident, Plaintiff's wife no longer accompanies him on any of his drives as she used to. *Id*. at 96:20–97:9, 100:4–10.

38. Plaintiff's wife testified she observed differences in his behavior after the accident, such as uncharacteristic displays of physical pain and fatigue. *Id*. at 100:19–101:6.

39. After the accident, while he can play soccer again, Plaintiff cannot head the ball with the same intensity as he used to, which makes him feel badly when asked about it by his teammates. *Id*. at 40:10–22.

### F. Expert Witness Testimony

40. Each side relied on testimony from two expert witnesses. *See* generally ECF Nos. 107–08.[4]

---

[4] Although Dr. Willingham and Dr. Freeman did not testify at the damages hearing, this Court ruled via order ECF No. 114 that their deposition testimony was admissible evidence the Court could consider for the matter of damages. However, this Court does not need to consider evidence for the issue of liability, as that has already been established in this case, "[p]ursuant to Federal Rule of Civil Procedure 37(b)(2)(A)(vi), default judgment on liability is entered against Defendants." *See* ECF No. 52.

41. Defendants' biomechanics expert acknowledged that Plaintiff suffered some form of injury from the accident. Feb. 21 Tr. Trans. at 93:18–23.

42. However, experts for each side disputed the type of and severity of the injury caused by the accident. *Id.* at 82:8–10, 83:17–84:14.

### a. Expert Witness Testimony – Dr. Freeman

43. Plaintiff presented an expert in injury biomechanics, Dr. Michael Freeman, to offer opinions regarding causation between the accident and Plaintiff's injuries, which were diagnosed by physicians and not Dr. Freeman, as detailed in Plaintiff's medical record. Michael Freeman Deposition Transcript, February 16, 2023 ("Freeman Dep.") at 42:2–12.

44. Plaintiff also offered Dr. Freeman as an expert in crash reconstruction, injury epidemiology, and injury causation, which were objected to by the defense. *Id.* at 42:17–24.

45. Dr. Freeman described injury biomechanics as how the force of the crash affects the individual who is in the vehicle during the crash, and injury epidemiology as the probability of a crash causing an individual's injury. *Id.* at 8:10–13.

46. Dr. Freeman generally works as a consultant in forensic medicine and evaluates how epidemiologic information can be used to determine causation and causality. *Id.* at 8:4–7.

47. He has a master's and a Ph.D. in epidemiology and a master's in forensic medicine. *Id.* at 9:8–9., 32:12–16.

48. Additionally, he received a doctorate in medicine from a program in Sweden, which he compared to a Ph.D. in medicine. *Id.* at 12:22–13:5.

49. His doctoral thesis researched crash–related injuries to the spine. *Id.* at 9:4–5.

50. Half of Dr. Freeman's Ph.D. minor was in injury biomechanics. *Id.* at 11:10–13.

51. He wrote and developed a graduate level curriculum in injury biomechanics. *Id.* at 11:17–18.

52. He has about sixty publications in injury biomechanics and has consulted for NASA and Congress in head injury biomechanics specifically. *Id.* at 11:19–24.

53. Dr. Freeman has hundreds of hours training in and has extensively studied and researched crash reconstruction. *Id.* at 8:9–10, 9:11–16, 10:7–16.

54. However, Dr. Freeman is not a clinical doctor and does not have a license to practice clinical medicine. *Id.* at 31:2–4.

55. Dr. Freeman estimated he has reconstructed at least three thousand crashes in his career. *Id.* at 10:17–18.

56. Dr. Freeman did perform crash reconstruction in this case. *Id.* at 27:17–19.

57. However, his report did not claim his opinions were offered to a reasonable degree of accident reconstruction certainty, epidemiological injury certainty, or biomechanical engineering certainty. *Id.* at 28:18–29:20.

58. Dr. Freeman testified Plaintiff suffered a disc protrusion as a result of the accident. *Id.* at 63:14–19.

59. After reviewing the details of the collision and Plaintiff's medical history, Dr. Freeman concluded the accident was scientifically the most probable cause versus all other causes of Plaintiff's initial neck pain and his ultimate reasons for seeking treatment. *Id.* at 61:20–62:2.

   **b. Expert Witness Testimony – Dr. Nobilini**

60. Alternatively, Defendants presented their own expert in biomechanics, Dr. Robert Nobilini. Trial Transcript, February 22, 2023 ("Feb. 22 Tr. Trans.") at 4:18–19.

61. Like Dr. Freeman, Dr. Nobilini is not a medical doctor and was not brought in to provide medical testimony. *Id.* at 31:2–14.

62. Dr. Nobilini has a Bachelor of Science, a Master of Science, and a Ph.D. in mechanical engineering, with a focus in biomechanics, from Drexel University. *Id.* at 5:5–8.

63. He described mechanical engineering as applying the laws of physics and applying them to the study, design, manufacturing, and maintenance of mechanical devices. *Id.* at 6:18–20.

64. He explained biomechanics as applying mechanical engineering knowledge to the human body under a mechanical perspective. *Id.* at 6:21–24.

65. He has conducted research and written publications in the field of biomechanics. *Id.* at 6:4–13, 6:25–7:17.

66. In this case, Dr. Nobilini did not conduct his own calculations or analysis of the accident. *Id.* at 31:15–20.

67. Dr. Nobilini testified that Dr. Freeman's calculations led to faulty scientific conclusions regarding the accident and Plaintiff's condition. *Id.* at 16:5–25, 17:14–18:14.

68. According to Dr. Nobilini, Dr. Freeman incorrectly conducted his calculations because he made baseless assumptions about the accident, including the speed at which Defendant's truck collided with Plaintiff's and the weight being carried by each vehicle. *Id.* at 12:21–14:11.

69. Dr. Nobilini stated these assumptions made a substantial difference in the outcome of Dr. Freeman's calculations pertaining to the accident. *Id.* at 14:12–16.

70. Further, Dr. Nobilini testified that Dr. Freeman misrepresented the impact of the initial force on Plaintiff's neck and head, implying Plaintiff incurred greater force on his neck than Dr. Nobilini believed to be accurate. *Id.* at 19:20–23:16.

71. Dr. Nobilini also testified that Dr. Freeman did not consider alternate causes, such as the impact of heading a soccer ball, which he believed a more plausible explanation for Plaintiff's disc protrusion. *Id.* at 26:23–27:16, 28:8–23, 30:5–14.

### c. Expert Witness Testimony – Dr. Berman

72. Defense's other expert witness, Dr. Arnold Berman, was the only clinical physician to personally diagnose and examine Plaintiff. Feb. 21 Tr. Trans. at 70:2–16, 72:3–10, 73:8–10; Freeman Dep. at 40:1–2; Willingham Dep. at 21:18–25.

73. Dr. Berman has a Bachelor of Science in Chemistry and his M.D., which was followed by a surgical internship, a residency in orthopedic surgery, and additional fellowship training. Feb. 21 Tr. Trans. at 68:7–13.

74. Dr. Berman is a board-certified orthopedic surgeon, and, at the time of the Hearing, had an active outpatient practice where he routinely saw and treated patients. *Id.* at 68:25–69:1, 69:18–70:15.

75. At the time he examined Plaintiff, Dr. Berman had extensive experience in orthopedic surgery but no long performed surgical operations. *Id.* at 69:1–70:4.

76. Dr. Berman has researched and been published in various areas of orthopedics. *Id.* at 70:17–71:6.

77. Prior to meeting with Plaintiff in person, Dr. Berman reviewed all of the available records from the various physicians who had previously treated Plaintiff. *Id.* at 73:8–14.

78. Additionally, Dr. Berman reviewed Plaintiff's radiologic studies, including the images of the x–rays and MRIs. *Id.* at 73:15–17.

79. After reviewing Plaintiff's medical history, Dr. Berman conducted a physical examination of Plaintiff, focusing on the vertebrae in Plaintiff's neck. *Id.* at 74:22–75:8.

80. When examined by Dr. Berman, Plaintiff had not appeared to be suffering any disability or abnormality. *Id.* at 91:17–18. However, he did have mild pain considered by Dr. Berman not to be disabling. *Id.* at 92:18–93:11.

81. Dr. Berman concluded that Plaintiff suffered a soft tissue injury, resulting in muscle spasms, which amounted to a muscular strain or sprain. *Id.* at 82:8–10.

82. He believed this muscular strain resolved itself. *Id.* at 82:5–10, 83:19–84:10.

83. Dr. Berman did not deny an absence of any injury from the accident, only an absence of any serious spinal injury. *Id.* at 93:18–23.

84. Dr. Berman testified to observing evidence of a chronic degenerative condition in Plaintiff's MRI images, which he stated develops over several years and does not stem from a single incident. *Id.* at 81:10–82:23.

85. Dr. Berman believed Plaintiff's surgery resolved a chronic condition unrelated to the muscular strain he experienced from the accident. *Id.* at 83:11–84:22.

86. According to Dr. Berman, the type of surgery Plaintiff underwent is almost always done to treat a chronic degenerative condition. *Id.* at 84:15–22.

87. Notably, Dr. Berman admitted there was no evidence Plaintiff experienced painful symptoms in his neck prior to the accident. *Id.* at 88:6–10.

   d. **Expert Witness Testimony – Dr. Willingham**

88. Plaintiff's other expert witness, Dr. Alex Willingham, testified as a medical expert in the field of life care planning. Willingham Dep. at 11:3–5.

89. A medical life care plan identifies categories of care which are considered medically necessary for a person to treat their condition and the cost of obtaining that care within the person's life expectancy. *Id.* at 5:8–15.

90. Dr. Willingham is a licensed clinical physician who has been practicing since 1981. *Id.* at 6:15–17, 8:9–13.

91. He obtained his M.D. from a Mexican medical school and completed his residency in New York. *Id.* at 6:18–23.

92. His specialties are physical medicine, which he describes as recovery for short–term conditions, and rehabilitation, which he describes as life–changing conditions. *Id.* at 7:3–18.

93. He sees patients through his outpatient clinic, a physician group, and a specialized brain injury program. *Id.* at 7:21–8:8.

94. Dr. Willingham testified to taking training courses in and obtaining his state and federal certifications in life care planning and has given he has given several symposiums on life care planning to a range of medical specialties. *Id.* at 5:21–6:14.

95. Dr. Willingham has been preparing life care plans as a practicing physician since the early 1990s. *Id.* at 6:2–4.

96. Dr. Willingham testified about the cost of Plaintiff's past and future medical care by creating a personalized medical life care plan and appropriate tables of costs for Plaintiff. *Id.* at 5:3–6, 8:21–9:5.

97. Dr. Willingham analyzed the cost of Plaintiff's care in the United States, not Mexico, because the majority of Plaintiff's care was anticipated to occur in Texas. *Id.* at 13:24–14:25.

98. Dr. Willingham admitted he would not be qualified to offer an opinion as to medical costs in Mexico. *Id.* at 15:14–20.

99. To create Plaintiff's personalized life care plan, Dr. Willingham initially looked to Plaintiff's medical records after the accident. *Id.* at 17:3–17.

100. He also evaluated Plaintiff in a preliminary Zoom call. *Id.* at 16:2–22.

101. Dr. Willingham created a chart summarizing billing for Plaintiff's past medical treatment based on the Zoom call and Plaintiff's medical records. *Id.* at 33:21–24.

102. He testified the costs for Plaintiff's medical treatment leading up to surgery were reasonable and customary in Texas. *Id.* at 34:24–35:2.

      i.    Outstanding Past Medical Costs of Plaintiffs Treatment

103. He totaled the outstanding past medical costs of Plaintiff's treatment after the accident at $164,484. *Id.* at 36:14–37:5.

      ii.    Future Costs of Medical Expenses

104. To calculate the future costs, Dr. Willingham determined Plaintiff's life expectancy using the World Health Organization Data and U.S. Life Tables. *Id.* at 38:17–24.

105. In doing so, Dr. Willingham's life care plan included Plaintiff's medical costs for thirty-eight years, his estimated life expectancy. *Id.* at 39:14–21.

106. Dr. Willingham determined the type of care Plaintiff would need according to his diagnosis included "physician care, therapy care, supportive medications, diagnostics…future surgical intervention, and some interventional pain management and then finally some accommodating equipment and supplies and replacement services." *Id.* at 43:15–19.

107. Additionally, Dr. Willingham testified to reasonable certainty Plaintiff will require an adjacent level surgery at least twenty years in the future. *Id.* at 44:16–21, 47:7–14.

108. Dr. Willingham calculated the cost of the outpatient services, such as annual doctor's visits, Plaintiff would need for the rest of his life at $28,685.58. *Id.* at 69:7–9; *see* Pls. Ex. 20 at pp. 21, 23; *see also* ECF No. 107 at ¶ 21.

14

109. Dr. Willingham testified Plaintiff would need several physical therapy appointments at random points in time for neck pain flare-ups. Willingham Dep. at 52:1–12.

110. He also testified Plaintiff would need a cluster of counseling appointments for his apparent adjustment issues, which were diminished physical intimacy with his wife and hypervigilance, which he experienced from constantly checking mirrors while driving in congested areas. *Id.* at 53:1–20.

111. Dr. Willingham calculated the cost of these therapeutic services that Plaintiff would need for the rest of his life at $47,960.66. *See* Pls. Ex. 20 at pp. 21, 23, *see also* ECF No. 107 at ¶ 22.[5]

112. Dr. Willingham predicted Plaintiff would only need intermittent Tylenol for the first ten to fifteen years after his surgery but may require stronger medication as he ages and if he does experience an adjacent segment disease. Willingham Dep. at 56:25–57:15.

113. Dr. Willingham calculated the ten to fifteen years of over-the-counter Tylenol and potential for stronger medications in the future at $52,209.08. *See* Pls. Ex. 20 at pp. 21, 23, *see also* ECF No. 107 at ¶ 23.[6]

114. Dr. Willingham testified Plaintiff would need annual follow up appointments after his surgery to evaluate the state of his neck, including evaluations of the status of his adjacent segment disease, and possible appointments for pain flare-ups. Willingham Dep. at 62:23–63:9.

---

[5] Plaintiffs Proposed Findings of Facts incorrectly identifies this amount as $43,960.66. However, Dr. Willingham's report correctly identifies this amount as $47,960.66. *See* Pls. Ex. 20 at pp. 21, 23.
[6] Plaintiffs Proposed Findings of Facts incorrectly identifies this amount as $52, 209.08. However, Dr. Willingham's report correctly identifies this amount as $53,209.08. *See* Pls. Ex. 20 at pp. 21, 23.

115. Dr. Willingham believed Plaintiff would require x–rays and MRIs because of his previous surgery and the risk of developing an adjacent level disease. *Id.* at 64:14–19.

116. Furthermore, Dr. Willingham testified as to the potential of as–needed diagnostics, such as blood count and urinalysis, specifically if Plaintiff suffered adverse reactions to stronger medications he may take in the distant future. *Id.* at 63:1–14.

117. Dr. Willingham calculated the total of diagnostics Plaintiff would need for the rest of his life at $19,829.78. *See* Pls. Ex. 20 at pp. 22, 23 *see also* ECF No. 107 at ¶ 24.

118. Dr. Willingham additionally recommended future procedures and acute care to account for possible flare–ups of pain if or until Plaintiff received another fusion surgery. Willingham Dep. at 65:3–17.

119. According to Dr. Willingham, certain types of these procedures would not be necessary for at least ten years at the time of his calculations. *Id.* at 65:21–23.

120. Additionally, other recommended procedures were no longer necessary if Plaintiff received another fusion surgery in the future. *Id.* at 65:24–66:8.

121. Dr. Willingham calculated the total of procedures and acute care Plaintiff would need for the rest of his life at $211,285.80. *See* Pls. Ex. 20 at pp. 22, 23 *see also* ECF No. 107 at ¶ 25.

122. Dr. Willingham testified Plaintiff would require equipment and supplies, such as grabbers, reachers, long handle shoehorns, bath sponges, and sock donners to minimize Plaintiff having to bend over. Willingham Dep. at 66:9–18.

123. The annual price of the equipment and supplies Dr. Willingham recommended equated to $151,897.50. *See* Pls. Ex. 20 at pp. 22, 23; *see also* ECF No. 107 at ¶ 26.

124. On cross examination, Dr. Willingham admitted he included an estimated $142,000 cost of landscaping services and maintenance to the outside of Plaintiff's home in Plaintiff's future cost projection despite knowing Plaintiff testified to never performing any sort of outside housework. Willingham Dep. at 81:12–82:16.

125. The overall cost of all the future care recommended by Dr. Willingham was $512,868.41. *Id*. at 69:13–16; *see* Pls. Ex. 20 at pp. 22, 23; *see also* ECF No. 107 at ¶ 27.

### G. Further Damages Requested

126. For the past and future mental and physical pain and suffering, including physical discomfort, treatments, mental anguish, adjustment to pain, and fears moving forward, Plaintiff seeks $150,000. *See* ECF No. 107 at pp. 13–15.

127. For all past and future loss of ability to enjoy the pleasures of life, both with his family and through playing soccer, Plaintiff seeks $150,000. *See id.* at pp. 15–19.

128. Plaintiff's overall request for relief is $977,352.41. *See id*. at p. 20.

129. Defendants contend Plaintiff is owed less than $50,000. *See* ECF No. 108 at p. 13.

## IV. DISCUSSION

### a. Applicable Standard

When conducting a bench trial, the Court is to find the facts and state the conclusions of law separately. Fed. R. Civ. P. 52(a)(1). "'The findings or conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.'" *Rodd v. Progressive Specialty Ins. Co.*, No. CV 21-4987, 2025 WL 539679, at *1 (E.D. Pa. Feb. 18, 2025) (citing Fed. R. Civ. P. 52(a)(1)). In a civil case, a Plaintiff has the burden of proving their claims by a preponderance of the evidence. *See id.*

To prove damages, "a plaintiff must give a factfinder evidence from which damages may be calculated to a reasonable certainty." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225–26 (3d Cir. 2003) (internal quotations omitted). An award for economic damages may include compensation for medical expenses and lost wages. *See Torres v. United States*, No. 5:21–CV–04953, 2023 WL 2368728, at *22 (E.D. Pa. Mar. 6, 2023) (citation omitted). An award of non–economic damages may include "compensation for a plaintiff's physical pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life including reduction in life expectancy." *DeCarlo v. United States*, No. 4:00–CV–1059, 2002 WL 31499281, at *34 (M.D. Pa. Sept. 11, 2002). Under Pennsylvania law, "a plaintiff is entitled to be compensated for all past medical expenses reasonably and necessarily incurred and all future medical expenses reasonably likely to be incurred for the treatment and care of his injuries." *McDonald v. United States*, 555 F. Supp. 935, 962 (M.D. Pa. 1983) (citations omitted).

## IV. CONCLUSIONS OF LAW

Based on the finding of facts expressed, the following are the Court's conclusions of law:

1. As established in this Court's May 15, 2024 Order and August 28, 2024 Order, the Court refused to permit arguments regarding causation between the pertinent accident and Plaintiff's damages. *See* ECF Nos. 113, 116 n.1. As emphasized in the Court's Memorandum Opinion, if Plaintiff still carried the burden of establishing causation, "default judgments would lose their extraordinariness [and] [d]efendants would be capable of stalling the administration of justice with no real threat of adequate recourse." ECF No. 113 at 10 n. 4. Therefore, causation has been established through default judgement.

2. Plaintiff has suffered injuries and/or damages as a result of the accident in the amount of $164,484.00.

3. Plaintiff has suffered injuries/damages which will require future medical expenses cost in the amount of $370,908.41.[7]

## V. CONCLUSION

For the reasons set forth, this Court finds that Plaintiff has met their burden of showing, by a preponderance of evidence, damages in the total amount of $535,392.41 as a result of the August 12, 2019 motor vehicle accident. An appropriate Order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Judge

---

[7] This amount takes into account the $512,868.41 Plaintiffs request for future medical expenses but subtracts $142,000.00 for "household services" as Dr. Willingham testified in his deposition that he was aware that Plaintiff testified he has never performed any sort of outside housework. *See* Willingham Dep. at 81:12–82:16.